**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA

v.

(1) WINSTON CARMONA RAMIREZ,
(2) LUIS FERNANDO MOSCAT SANTOS,
[redacted]
(4) ALEXANDER BEITO ARIAS LUGO,

*Defendants*.

M.J. Nos.
26-mj-3334-JDH
26-mj-3335-JDH
26-mj-3336-JDH
26-mj-3337-JDH
26-mj-3338-JDH

**FILED UNDER SEAL**

**AFFIDAVIT OF JOSEPH FITZPATRICK IN SUPPORT OF APPLICATIONS FOR A CRIMINAL COMPLAINT AND SEARCH WARRANTS**

I, Special Agent Joseph Fitzpatrick, being sworn, state:

**Introduction and Agent Background**

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I have been employed by the Drug Enforcement Administration ("DEA") since August 2024. I am currently assigned to the New England Field Division, Task Force 1, as a Special Agent, where I investigate drug trafficking and money laundering organizations and their ties to violent crime. I graduated from the DEA Basic Agent Training Academy in Quantico, Virginia in December 2024, where I received specialized training in narcotics and money laundering investigations and related legal matters. In 2021, I received a Bachelor of Science degree in Criminal Justice from the University of New Haven.

3. Before joining the DEA, I was employed as a police officer in the town of Webster, Massachusetts. I graduated from the Boylston Police Academy in October 2021. This academy is run by the Massachusetts Police Training Committee ("MPTC").

4. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

5. Further, based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities. I also know that drug traffickers are aware of law enforcement's use of electronic surveillance, and thus, frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information), and use cellular telephones subscribed under a different person's name, in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.

6. Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones.

**Purposes of the Affidavit**

7. I submit this affidavit in support of a criminal complaint against Winston CARMONA RAMIREZ ("CARMONA"), Luis Fernando MOSCAT SANTOS ("MOSCAT"), [redacted] and Alexander Beito ARIAS LUGO ("ARIAS") (collectively, the "Charged Subjects") charging them with conspiracy to distribute and to possess with intent to distribute controlled substances, starting at least in or about March 2026, and continuing through at least in or about September 2026, in violation of Title 21, United States Code, Section 846 (the "Charged Offense"). I am also investigating the Charged Subjects for violations of Title 21, United States Code, Section 841(a)(1) (distribution of and possession with intent to distribute controlled substances) (together with the Charged Offense, the "Target Offenses").

8. I also submit this affidavit in support of applications for search warrants for the following persons, and the cellular phones in their possession, collectively, the "Target Phones":

a. The person of CARMONA and any computer equipment, including cellular phones, in his possession, further described in Attachment A-1, for evidence related to the Target Offenses as described in Attachment B.

b. The person of MOSCAT and any computer equipment, including cellular phones, in his possession, further described in Attachment A-2, for evidence related to the Target Offenses as described in Attachment B.

c. [redacted]

d. The person of ARIAS and any computer equipment, including cellular phones, in his possession, further described in Attachment A-4, for evidence related to the Target Offenses as described in Attachment B.

9. As further described below, there is probable cause to believe that: (a) the Charged Subjects have committed the Charged Offense, (b) the Charged Subjects have committed, are committing, and will continue to commit the Target Offenses; (c) the Charged Subjects have used the Target Phones in furtherance of the Target Offenses; and (d) searches of the Charged Subjects and Target Phones will lead to evidence, fruits, and instrumentalities of the Target Offenses, described in Attachment B, as well as to the identification of other individuals who are committing those and related crimes.

10. As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. I submit this affidavit for the limited purpose of establishing probable cause for the requested warrants and for the criminal complaint. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

## Probable Cause

### I. Background

11. Since well before March 2026, I and other officers have been investigating the Charged Subjects. As part of this investigation, investigators have enlisted a confidential source ("CS-1")[1] and undercover officer ("UC-1") to make controlled purchases of fentanyl and methamphetamine as early as March 16, 2026.

12. Each of the sales was brokered through a co-conspirator ("CC-1").[2] In each instance, CC-1 dispatched one of the Charged Subjects to deliver the drugs to CS-1 or UC-1. All communications between CS-1 and CC-1 were recorded and preserved.

***In March and April 2026, CC-1 arranged and CARMONA sold CS-1 100 grams of fentanyl on three separate occasions***

13. CARMONA delivered fentanyl to CS-1 on three separate occasions, on March 16, 2026, March 27, 2026, and April 13, 2026. In each instance, CS-1 and CC-1 arranged for the deal, and CARMONA arrived to deliver the drugs. After each sale, the drugs were sent to the DEA laboratory for testing, and the drugs tested positive for fentanyl, with weights of 99 grams, 99 grams, and 97 grams respectively. Each of these purchases was recorded by CS-1 and surveilled

---

[1] CS-1 has a criminal record including multiple charges for possession of narcotics, and convictions for felon in possession of a dangerous weapon and receipt of stolen property. CS-1 became a confidential source following CS-1's arrest by police for narcotics violations. CS-1 initially cooperated to receive leniency in the state sentencing. The state charges have since been dismissed. CS-1 is currently cooperating with investigators in exchange for payment. The information provided by CS-1 has, to the extent possible, been corroborated. Information provided by CS-1 has led to the seizure of narcotics and the identification of narcotics traffickers. Thus, I believe information provided by CS-1 to be reliable.

[2] Investigators believe they have identified CC-1, but I am withholding his name from this affidavit to protect an ongoing investigation and because he is not charged in the requested complaint.

by investigators. For each purchase, investigators followed the procedures described below. What follows is a detailed description of the April 13, 2026 deal.

14. On April 12, 2026, CS-1 contacted CC-1 to arrange, in lightly coded language, for the purchase of ten “sticks” of fentanyl in exchange for $1,300. Based on my training and experience, a stick of fentanyl, also known as a “finger,” is approximately ten grams of fentanyl. CS-1 and CC-1 arranged for the deal to take place on April 13, 2026, and was set to take place at 38 Allston Street in Lawrence, Massachusetts. These communications are preserved.

15. In preparation for the deal, investigators began surveillance of the area. Investigators also met with CS-1 at a predetermined location and searched CS-1 for contraband and currency with negative results. Investigators equipped CS-1 with official DEA funds to make the purchase, as well as an audio/video recording and contemporaneous monitoring device. CS-1 was surveilled from this search until the time CS-1 returned to investigators after the deal. Following this meeting with investigators, CS-1 went to the meeting location.

16. Prior to the deal, investigators were surveilling CARMONA. Investigators observed CARMONA meet with multiple individuals before getting into a black van and driving to the meeting location. As CARMONA was driving to the deal, CS-1 was communicating about his location with CC-1. CS-1 arrived at the meeting location. When CARMONA arrived, his car circled the block before returning to 38 Allston Street. Based on training and experience, I know that is a counter-surveillance technique that is common among drug traffickers to avoid law enforcement detection. After circling the block, CARMONA parked near CS-1’s car, walked over to the passenger window of CS-1’s car, and handed CS-1 a winter glove containing ten sticks of

fentanyl. In exchange, CS-1 gave CARMONA the $1,300 of DEA funds. A picture of the glove containing the drugs is below:



17. The entire interaction took under 30 seconds. CARMONA quickly left the area, and investigators terminated surveillance. CS-1 returned to a predetermined meeting location, where CS-1 was searched for contraband and currency with negative results. CS-1 gave the glove containing the drugs to investigators, who sent the drugs to the DEA laboratory for testing. The DEA laboratory determined that the powder was fentanyl, with a net weight of 97 grams.

***In April and May 2026, CC-1 arranged and MOSCAT sold CS-1 120 grams of fentanyl or suspected fentanyl on two separate occasions***

18. MOSCAT delivered fentanyl or suspected fentanyl to CS-1 on two separate occasions, on April 30, 2026, and May 12, 2026. In each instance, CS-1 and CC-1 arranged for the deal, and MOSCAT arrived to deliver the drugs. Each of these purchases was recorded by CS-1

and surveilled by investigators. For each purchase, investigators followed the procedures described below. After each sale, the drugs were sent to the DEA laboratory for testing. The April 30, 2026 drugs tested positive for fentanyl, and the May 12, 2026 results are pending. Given the course of conduct, other purchases brokered by CC-1 that tested positive for fentanyl, and the physical appearance of the drugs, I believe the substances sold by MOSCAT on May 12, 2026 also contain fentanyl. What follows is a detailed description of the May 12, 2026 deal.

19. In the days leading up to May 12, CS-1 coordinated with CC-1 to purchase another 100 grams of fentanyl for $1,300. The two arranged for the deal to take place on the evening of May 12. All communications between CS-1 and CC-1 were recorded and preserved.

20. On the evening of May 12, investigators met with CS-1 and searched CS-1 for contraband and currency with negative results. Investigators equipped CS-1 with official DEA funds to make the purchase, as well as an audio/video recording and contemporaneous monitoring device. CS-1 was surveilled from this search until the time CS-1 returned to investigators after the deal. CS-1 then went to the meeting location, which CC-1 told CS-1 would be 6 Melrose Terrace in Lawrence, Massachusetts.

21. Meanwhile, investigators established surveillance at the meeting location. When CS-1's car pulled up, investigators saw MOSCAT walk towards the car. When he got to the driver's side window, MOSCAT handed CS-1 a bag containing ten cylindrical stick-shaped packages of pressed powder, or sticks, of suspected fentanyl, in exchange for the $1,300 investigators had provided to CS-1. After the exchange, MOSCAT left the area on foot. A picture of the suspected drugs is below:



22. After the deal, CS-1 returned to a predetermined meeting location, where CS-1 was searched for contraband and currency with negative results. CS-1 gave the bag containing the suspected fentanyl to investigators, who sent the drugs to the DEA laboratory for testing. Results are pending. Given the course of conduct, other purchases brokered by CC-1 that tested positive for fentanyl, and the physical appearance of the substance, I believe the substance contains fentanyl.

[redacted]

---

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

***On September 1, 2026, CC-1 arranged the sale of, and ARIAS sold, 500 grams of suspected fentanyl to CS-1***

29. In the days leading up to September 1, 2026, CS-1 coordinated with CC-1 to purchase 500 grams of fentanyl for $5,000. The two arranged for the deal to take place on the afternoon of September 1, 2026. All communications between CS-1 and CC-1 were recorded and preserved.

30. Prior to the deal, investigators met with CS-1 and searched CS-1 for contraband and currency with negative results. Investigators equipped CS-1 with official DEA funds to make the purchase, as well as an audio/video recording and contemporaneous monitoring device. CS-1 was surveilled from this search until the time CS-1 returned to investigators after the deal. CS-1 then went to the meeting location, which CC-1 told CS-1 would be 134 Gilbert Street in Lawrence, Massachusetts.

31. Meanwhile, investigators established surveillance at the meeting location. CS-1 arrived shortly after 4:00 p.m., and CS-1 waited for nearly an hour. Shortly after 5:00 p.m., a tan Toyota Sienna arrived and parked behind CS-1's car. ARIAS was the driver. CS-1 got out of the car and entered ARIAS' car. Once inside the car, CS-1 exchanged the $5,000 for 50 sticks of suspected fentanyl powder, weighing approximately 500 grams. Following the deal, CS-1 left the

car, and ARIAS drove away. Shortly after ARIAS drove away, investigators initiated a traffic stop on his car, where they confirmed his identity by viewing his driver's license.

32. After the deal, CS-1 returned to a predetermined meeting location, where CS-1 was searched for contraband and currency with negative results. CS-1 gave the bag containing the suspected fentanyl to investigators. The suspected fentanyl was sent to the DEA laboratory for testing, and results are pending. Based on the prior course of conduct, the request for fentanyl, the physical appearance and packaging of the substance, the $5,000 payment, and the similarity to the other deals that tested positive for fentanyl, I believe the substance contains fentanyl.

**Drug Traffickers' Use of Cell Phones Generally**

33. All of the controlled purchases conducted by the Charged Subjects described above were arranged by CC-1. Investigators believe that CC-1 is not located in Massachusetts. Therefore, CC-1 likely communicated with each of the Charged Subjects by telephone to provide them the drug quantity, price, meeting location, and meeting time to ensure that each of the Charged Subjects arrived at the drug deals at the appropriate place and time with the correct quantity of drugs. [redacted] Similarly, investigators believe that CC-1 had similar communications with [redacted] and the other Charged Subjects prior to, and after, the controlled sales in which they sold drugs to CS-1 or UC-1. Therefore, based on experience and training and the information provided below, investigators believe that each of the Charged Subjects uses at least one cellular phone in furtherance of violations of the Target Offenses. Investigators further believe that evidence of the Target Offenses,

described in Attachment B, will be located on the Charged Subjects' persons and in their cellular phones.

34. Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

35. Based upon my knowledge, training, and experience, a wireless telephone usually contains a "call log" that records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing

back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

36. Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

37. Additionally, I know that many drug traffickers often use cellular telephones to communicate quickly and economically with their suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their

actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

38. Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data

remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## UNLOCKING DEVICES USING BIOMETRIC FEATURES

39. I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

40. On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to

5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

41. The passcode(s) that would unlock the device(s) located on the persons of the Charged Subjects are not currently known to law enforcement. Thus, it may be useful to press the finger(s) of the user(s) of the device(s) found during the search of the Charged Subjects to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

42. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Charged Subjects to the sensor of the devices or place the devices in front of his

face for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

43. The law enforcement agents will endeavor to search and seize only the computer equipment and cell phones which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

**Conclusion**

44. WHEREFORE, I submit that there is probable cause to believe that (a) the Charged Subjects have committed the Charged Offense, (b) the Charged Subjects have committed, are committing, and will continue to commit the Target Offenses; (c) the Charged Subjects have used the Target Phones in furtherance of the Target Offenses; and (d) searches of the Charged Subjects and the Target Phones will lead to evidence, fruits, and instrumentalities of the Target Offenses, described in Attachment B, as well as to the identification of other individuals who are committing those and related crimes.

Respectfully submitted,

*Joseph Fitzpatrick (JDH)*
Joseph Fitzpatrick, Special Agent
Drug Enforcement
Administration

Sworn to via telephone in accordance with Fed R. Crim. P. 4.1 on September 15, 2026

Honorable Jessica D. Hedges

United States Magistrate Judge

**Attachment A-1**

The person of Winston Carmona Ramirez, born in 2002, and any computer equipment, including cellular phones, found on his person. He is pictured below:





**Attachment A-2**

The person of Luis Fernando Moscat Santos, born in 1999, and any computer equipment, including cellular phones, found on his person. The man to be searched is pictured below:



[redacted]

**Attachment A-4**

The person of Alexander Beito Arias Lugo, born in 1998, and any computer equipment, including cellular phones, found on his person. He is pictured below:



**Attachment B**

1. All records and tangible objects in whatever form, from March 1, 2026 to present, that constitute evidence, fruits, or instrumentalities of violations of the Charged Offense:

A. Controlled substances, including but not limited to fentanyl, cocaine, methamphetamine, and materials used to "cut" or dilute those substances.

B. Books, records, receipts, notes, ledgers, and other papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers or relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, photographs, telephone address books; planners; notes; ledgers; prescriptions; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

C. Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious

metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

2. Cellular telephones used by the Charged Subjects and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

A. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

B. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

C. Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

D. Social media and other messaging platforms, including Signal, that can be used to communicate with others;

E. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

F. GPS data;

G. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or

referencing drug trafficking or individuals engaged in drug trafficking;

H. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

I. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

J. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the execution of the search of the cellular phones, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using biometric features, this warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the Charged Subjects to the fingerprint scanner of the devices found on their persons and (2) hold the devices found on the Charged Subjects in front of the Charged Subjects' faces and activate the facial recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The warrant does not authorize law enforcement to compel the Charged Subjects to state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the warrant does not authorize law enforcement to compel the Charged Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices. This warrant does not authorize the use of unreasonable physical force to secure compliance with its authorizations.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**DEFINITIONS**

For the purpose of this warrant:

1. “Computer equipment” means any computer hardware, computer software, mobile phone, storage media, and data.

2. “Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

3. "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

4. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

5. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

6. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**RETURN OF SEIZED COMPUTER EQUIPMENT**

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.